UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 14-81102-CIV-COHN/SELTZER

ADOBE SYSTEMS INCORPORATED,

     Plaintiff,

v.

BEA'S HIVE LLC; FULFILLMENT
SOLUTION  SERVICES, LLC;
NEW EPIC MEDIA, LLC;
SELACORP, LTD.; SUPREME
GROWERS LLC; VEGALAB, LLC;
STEVEN BLACKBURN; DAVID
SELAKOVIC; and DOES 1-19,

     Defendants.

_____/

## ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

**THIS CAUSE** is before the Court on Plaintiff's Motion for Preliminary Injunction [DE 5] ("Motion"). The Court has carefully reviewed the Motion and all filings supporting and opposing the Motion. The Court also held a two-day hearing at which the parties offered testimony, exhibits, and arguments regarding the Motion. Following the hearing, the parties filed proposed findings of fact and conclusions of law. Having considered all this information, the Court finds that the following facts have been established by a preponderance of the evidence:

### Findings of Fact

1.    Plaintiff Adobe Systems Incorporated ("Adobe") is a world-famous global leader in the manufacture and distribution of software products. [Tr. of Prelim. Inj. Hr'g, Sept. 8, 2014, Volume 1 ("Vol. 1"), at 32:20-33:5, 131:15-21.]

2. Adobe is the owner of the valid trademarks listed in Exhibit A to Adobe's Proposed Findings of Fact and Conclusions of Law [DE 51-1]. [Vol. 1 at 132:15-133:11; Prelim. Inj. Hr'g Ex. ("Ex.") 7.]

3. Adobe is the owner of valid copyrights to the software products listed in Exhibit B to Adobe's Proposed Findings of Fact and Conclusions of Law [DE 51-2]. [Vol. 1 at 132:15-133:11; Ex. 8.]

4. Adobe expends a significant amount of time, money, and other resources developing, promoting, and marketing its software products featuring its trademarks and copyrights as well as enforcing and protecting those trademarks and copyrights. [Vol. 1 at 125:5-126:4, 142:16-143:5; Tr. of Prelim. Inj. Hr'g, Sept. 10, 2014, Volume 2 ("Vol. 2"), at 294:10-195:18; Ex. 15.]

5. Every Adobe software product is accompanied by a Software License Agreement, which provides only a license to use the software and restricts any unauthorized sale or transfer of the software. [Vol. 1 at 118:7-21, 126:5-128:25, 139:12-13, 140:23-142:14, 143:23-144:8; Vol. 2 at 247:10-18, 285:6-25, 301:16-20, 326:9-14, 329:5-334:4, 340:6-341:4; Exs. 2, 4, 15, 16 (see Preamble, §§ 1.5, 2.1.1, 3, 4.6.1, 4.6.2, 16.3), 44-48, 55, 67-78, 85.]

6. Adobe manufactures and licenses Original Equipment Manufacturer ("OEM") versions of its software products, which are bundled with specific hardware or services. [Vol. 1 at 118:7-21, 128:5-15, 133:19-135:18, 149:12-24; 150:16-151:16; Vol. 2 at 231:13-16, 247:10-18, 285:6-25, 326:12-14, 329:5-334:4, 340:6-341:4; Exs. 2, 4, 9, 15, 16 (see Preamble, §§ 1.5, 2.1.1, 3, 4.6.1, 4.6.2), 44-48, 55, 67-78, 85.]

7.   Adobe's OEM software may not be unbundled from its intended hardware or services.  [Vol. 1 at 118:7-21, 128:5-15, 133:21-134:3, 149:12-24, 150:16-151:16; Vol. 2 at 231:13-16, 247:10-18, 285:6-25, 326:12-14, 329:5-334:4, 340:6-341:4; Exs. 2, 4, 9, 15, 16 (see Preamble, §§ 1.5, 2.1.1, 3, 4.6.1, 4.6.2), 44-48, 55, 67-78, 85.]

8.   Adobe's OEM software may not be sold separately from its intended bundled hardware or services.  [Vol. 1 at 118:7-21, 128:5-15, 133:21-134:3, 149:12-24, 150:16-151:16; Vol. 2 at 231:13-16, 247:10-18, 285:6-25, 326:12-14, 329:5-334:4, 340:6-341:4; Exs. 2, 4, 9, 15, 16 (see §§ 2.1.1, 4.6.1, 4.6.2), 44-48, 55, 67-78, 85.]

9.   Adobe's OEM software is not the same as the full retail versions of Adobe's software, which offer additional services such as technical support and the ability for the customer to upgrade to another version of the software at a discount.  [Vol. 1 at 118:7-21, 128:5-15, 134:11-135:18; Vol. 2 at 247:10-18, 285:6-25, 326:12-14, 329:5-334:4, 340:6-341:4; Exs. 2, 4, 15, 16 (see §§ 2.1.1, 4.6.1, 4.6.2), 44-48, 55, 67-78, 85.]

10.   Adobe manufactures and licenses educational or academic ("EDU") versions of its software products.  [Vol. 1 at 118:7-21, 127:25-128:4, 135:21-137:15; Vol. 2 at 326:9-11, 329:5-330:8, 333:20-334:22, 340:6-341:4; Exs. 2, 4, 10, 15, 16 (see Preamble, §§ 1.5, 2.1.1, 3, 4.6.1, 4.6.2, 16.3), 44-48, 55, 67-78, 85.]

11.   Adobe's EDU software may only be distributed to qualified educational or academic customers.  [Vol. 1 at 118:7-21, 127:25-128:4, 136:15-137:9, 152:3-21; Vol. 2 at 326:9-11, 329:5-330:8, 333:20-334:22, 340:6-341:4; Exs. 2, 4, 10, 15, 16 (see §§ 2.1.1, 16.3), 44-48, 55, 67-78, 85.]

3

12.     Adobe's EDU software is restricted to a limited number of copies a particular

        user can acquire, and the software expires after a period of time.  [Vol. 1 at

        118:7-21, 127:25-128:4; Vol. 2 at 32:9-11, 329:5-330:8, 333:20-334:22,

        340:6-341:4; Exs. 2, 4, 15, 16 (see §§ 2.1.1, 3, 16.3), 44-48, 55, 67-78, 85.]

13.     Adobe's EDU software may not be resold or transferred.  [Vol. 1 at 118:7-21,

        127:25-128:4, 137:12-15, 145:22-146:2, 150:16-151:9; Vol. 2 at 326:9-11,

        329:5-330:8, 333:20-334:22, 340:6-341:4; Exs. 2, 4, 15, 16 (see §§ 2.1.1, 4.6.1,

        4.6.2), 44-48, 55, 67-78, 85.]

14.     Adobe's EDU software is not the same as full retail versions of Adobe's software,

        which offer additional services such as technical support and the ability for the

        customer to upgrade to another version of the software at a discount.  [Vol. 1 at

        118:7-21, 127:25-128:4, 135:21-137:15, 144:9-10; Vol. 2 at 274:5-67, 326:9-11,

        329:5-330:8, 333:20-334:22, 340:6-341:4; Exs. 2, 4, 15, 16 (see Preamble,

        §§ 1.5, 2.1.1, 3, 4.6.1, 4.6.2, 16.3), 44-48, 55, 67-78, 85.]

15.     Adobe restricts use of its software to certain geographic territories.  [Vol. 1 at

        127:1-3, 128:17-25, 145:9-17, 162:12-163:12; Exs. 15, 16 (see Preamble,

        §§ 1.5, 2.1.1, 3).]

16.     Adobe software manufactured overseas is not intended to be sold or distributed

        within the United States.  [Vol. 1 at 128:17-25, 162:12-17; Exs. 15, 16

        (see Preamble, §§1.5, 2.1.1, 3).]

17.     Through the duration of their infringing conduct discussed herein, Defendants

        were familiar with the terms of conditions of Adobe's Software License

        Agreement.  [Vol. 1 at 38:16-23, 40:4-23, 41:8-42:17, 118:7-21; Vol. 2 at

                                            4

328:20-330:15, 332:14-334:13, 337:17-339:23, 340:6-341:4; Exs. 16, 85;
see also Exs. 2, 4, 44-48, 55, 67-78.]

18. Defendants' sales invoices reference the licensing agreement and restrictions
that accompany every software product, including Adobe's.  [Vol. 1 at 38:16-23,
40:4-23, 41:8-42:17, 118:7-21; Vol. 2 at 328:20-330:15, 332:14-334:13,
337:17-339:2; Exs. 2, 4, 44-48, 55, 67-78, 85.]

19. Defendants have never made any request to Adobe to become an authorized
dealer, reseller, or retailer of Adobe software.  [Vol. 2 at 339:24-340:5.]

20. Adobe has never granted any of the Defendants the right to sell, transfer, or
distribute its software.  [Vol. 1 at 138:10-139:10; Ex. 15.]

21. Defendants have sold counterfeit products featuring Adobe's trademarks.  [Vol. 1
at 17:25-18:3 (noting that the products produced on 9/8/14 were "inventory"),
19:21-22, 41:8-42:17, 123:4-124:13, 174:19-180:2; Vol. 2 at 191:15-194:9 (box
containing counterfeit Adobe boxes was labeled as containing 80 pieces but only
contained 27), 194:11-197:20, 199:20-207:16, 209:8-210:23, 211:18-212:15,
221:4-222:4, 244:11-24, 247:10-249:18, 253:13-15, 262:11-23, 264:7-14,
265:1-5, 280:2-17, 282:4-10, 282:16-283:15; Exs. 17, 18, 26, 30, 31, 90, 97, 98;
see also Vol. 2 at 215:10-217:10; Exs. 37, 63.]

22. Defendants illegally sell modified Adobe software by providing customers with
software boxes without any CDs, which Abobe does not manufacture.  [Vol. 1 at
149:6-24; Vol. 2 at 215:10-217:10, 221:4-222:4, 244:11-24, 262:11-25, 321:2-14;
Ex. 97; see also Vol. 1 at 41:8-42:17; Exs. 37, 63.]

23. Defendants have used Adobe's trademarks in the meta tags for various websites
selling unauthorized versions of Adobe's software.  [Vol. 1 at 69:25-70:8.]

24.   By creating "blind" sites for their customers to download Adobe software, instead of directing customers to www.adobe.com to conduct the download, Defendants have illegally copied Adobe's copyrighted software.  [Vol. 1 at 108:8-110:1; Vol. 2 at 247:10-249:18, 276:16-22.]

25.   Defendants have altered the copyrighted code for Adobe's software when providing that software in a downloadable form.  [Vol. 1 at 149:6-11; Vol. 2 at 247:10-249:18.]

26.   Defendants have used copyrighted images of Adobe's products from Adobe's website on or in connection with their own websites.  [Vol. 1 at 70:15-71:12, 95:12-96:4.]

27.   Defendants have sold OEM versions of Adobe's software in violation of Adobe's licensing restrictions.  [Vol. 1 at 41:8-42:17, 73:24-75:20, 98:20-99:17, 104:18-25, 180:3-183:15; Vol. 2 at 199:20-201:12, 209:8-18, 211:18-213:22; Vol. 2 at 229:2-17; Exs. 15, 19-23, 27, 31-33, 38, 43, 51, 52, 56, 60, 61, 66, 90.]

28.   Defendants have sold unauthorized OEM versions of Adobe's software, which feature Adobe's trademarks and copyrights.  [Vol. 1 at 41:8-42:17, 98:20-99:17, 104:18-25, 180:31-183:15; Vol. 2 at 199:20-201:12; Exs. 15, 19-23, 27, 31-33, 38, 43, 51, 52, 56, 60, 61, 66, 90.]

29.   Defendants knew that OEM versions of Adobe software are bundled with hardware or services, but they sold that software separated from its bundle. [Vol. 1 at 118:7-21; Vol. 2 at 247:10-18, 285:6-25, 326:12-14 ("Q: Do you understand the difference between OEM software and whole retail software? [Blackburn]: I do."), 329:5-334:4, 340:6-341:4; Ex. 85; see also Vol. 2 at 280:2-17; Exs. 2, 4, 44-48, 55, 67-78.]

30.    Defendants have sold EDU versions of Adobe's software in violation of Adobe's

licensing restrictions.  [Vol. 1 at 40:4-23, 41:8-42:17, 73:5-23, 93:18-94:25,

96:11-97:17, 104:3-17, 106:14-19, 107:7-22, 182:16-183:15; Vol. 2 at

199:20-201:12, 208:15-209:7, 214:14-215:5, 229:2-17, 334:5-22; Exs. 1-2,

13-15, 21, 23-25, 28-30, 34-36, 39-41, 44, 50, 56-57, 60-62, 64-65, 90.]

31.    Defendants have sold unauthorized EDU versions of Adobe's software, which

feature Adobe's trademarks and copyrights.  [Vol. 1 at 40:4-23, 41:8-42:17,

73:5-23, 93:18-94:25, 96:11-97:17, 104:3-17, 106:14-19, 182:16-183:15; Vol. 2

at 334:5-22; Exs. 1-2, 13-15, 21, 23-25, 28-30, 34-36, 39-41, 44, 50, 56-57,

60-62, 64-65, 90.]

32.    Defendants knew that EDU versions of Adobe software may only be sold to

qualified students and individuals in academia, but they sold such software

without obtaining any prior qualifications.  [Vol. 1 at 118:7-21; Vol. 2 at 326:9-11

("Q: Do you understand the difference between educational and for retail

software? [Blackburn]: I do."), 329:5-330:8, 333:20-334:22, 340:6-341:4; Ex. 85;

see also Exs. 2, 4, 44-48, 55, 67-78.]

33.    Defendants are aware of customers' complaints about their receipt of an EDU

version of Adobe software when the customer thought he or she purchased a full

retail version of the software.  [Vol. 1 at 41:8-42:17, 110:24-111:16; Vol. 2 at

334:24-337:15; Ex. 49.]

34.    Defendants have sold within the United States versions of Adobe's software not

intended for distribution within the United States, thereby violating Adobe's

licensing restrictions.  [Vol. 1 at 40:4-23, 41:8-42:17, 180:17-181:17,

182:5-183:15, 209:8-23, 213:17-214:12; Exs. 1-2, 13-15, 21-25, 27-30, 35-36, 38-39, 42-43, 50, 56, 61, 64-65, 90.]

35. Defendants have sold unauthorized foreign-made versions of Adobe's software, which feature Adobe's trademarks and copyrights.  [Vol. 1 at 40:4-23, 41:8-42:17, 180:17-181:17, 182:5-183:15; Exs. 1-2, 13-15, 21-25, 27-30, 35-36, 38-39, 42-43, 50, 56, 61, 64-65, 90.]

36. Adobe has inspected all software obtained through the September 2, 2014, civil seizure, and the software obtained on September 8, 2014, and found that all the software is counterfeit, unauthorized OEM, unauthorized EDU, or gray market software that is not authorized to be distributed in the United States.  [Vol. 1 at 170:17-183:15; Vol. 2 at 188:12-197:20, 208:15-215:4, 234:16-235:7, 270:2-23; Exs. 17-43, 90, 97.]

37. Adobe has analyzed all of Defendant Bea's Hive LLC's sales invoices and has found that all the software listed for sale is unauthorized OEM, unauthorized EDU, or gray market software that is not authorized to be distributed in the United States.  [Vol. 1 at 40:4-23; Vol. 2 at 229:2-17; Exs. 2, 4, 44-48, 55, 85.]

38. Adobe's trademarks are world-famous.  [Vol. 1 at 32:20-33:9, 36:21-25, 37:19-23, 70:9-14, 86:25-87:4, 96:15-21.]

39. Adobe's trademarks are strong.  [Vol. 1 at 32:20-33:9, 36:21-25, 37:19-23, 70:9-14, 86:25-87:4, 96:15-21; see also Ex. 7.]

40. Adobe's trademarks have achieved secondary meaning in the minds of the consuming public.  [Vol. 1 at 32:20-33:9, 36:21-25, 37:19-23, 70:9-14, 86:25-87:4, 96:15-21; see also Ex. 7.]

41.   Defendants use identical versions of Adobe's trademarks.  [Vol. 1 at 38:16-23, 40:4-23, 41:8-42:17; compare Exs. 1-2, 4, 12-15, 17-48, 55-57, 59, 61-79, 85, 89-90, 96-97, with Exs. 7, 9-10.]

42.   Adobe uses its trademarks in connection with its manufacture, import, export, and distribution of software.  [Vol. 1 at 32:20-33:5, 131:15-21; Exs. 7, 9-10.]

43.   Defendants use Adobe's trademarks in commerce in connection with software. [Vol. 1 at 38:16-23, 40:4-23, 63:14-24; Exs. 1-2, 4, 12-15, 17-48, 55-57, 59, 61-79, 85, 89-90, 96-97.]

44.   Defendants use Adobe's trademarks in commerce in connection with the same type of goods Adobe sells.  [Vol. 1 at 38:16-23, 40:4-23, 41:8-42:17, 63:14-24; Exs. 1-2, 4, 7, 9-10, 12-15, 17-48, 55-57, 59, 61-79, 85, 89-90, 96-97.]

45.   Adobe sells its software products through the Internet and to resellers.  [Vol. 1 at 137:17-25; Ex. 15.]

46.   Defendants sell their Adobe software products through the Internet and to resellers.  [Vol. 1 at 38:16-23, 40:4-23, 41:8-42:17; Exs. 2, 4, 15, 44-49, 51-52, 55, 67-78, 85-86, 90, 92-95.]

47.   Adobe advertises its software products through the Internet.  [Vol. 1 at 133:14-20; Ex. 15.]

48.   Adobe advertises its software products within the United States, including in the Southern District of Florida.  [Vol. 1 at 133:14-20; Ex. 15.]

49.   Defendants advertise their Adobe software products through the Internet.  [Vol. 2 at 342:23-344:19.]

50.   Defendants advertise their Adobe software products within the United States, including in the Southern District of Florida.  [Vol. 2 at 342:23-344:19.]

9

51.   Defendants' use of Adobe's trademarks occurred after the trademarks were registered with the United States Patent and Trademark Office.  [Vol. 1 at 38:16-23, 40:4-23, 41:8-42:17; compare Ex. 7, with Exs. 1-2, 4, 12-15, 17-48, 55-57, 59, 61-79, 85, 89-90, 96-97.]

52.   Defendants' use of Adobe's trademarks occurred after the trademarks became famous.  [Vol. 1 at 38:16-23, 40:4-23, 41:8-42:17; compare Ex. 7, with Exs. 1-2, 4, 12-15, 17-48, 55-57, 59, 61-79, 85, 89-90, 96-97.]

53.   Adobe has never authorized Defendants to use any of its trademarks.  [Vol. 1 at 138:10-139:10; Vol. 2 at 286:9-19; Ex. 15.]

54.   Defendants commit unfair business practices and false advertising by selling OEM and/or EDU versions of Adobe's software in the place of full retail versions.  [Vol. 1 at 110:2-111:16, 120:13-121:11.]

55.   Adobe receives complaints from resellers and customers when their limited OEM and/or EDU versions of Adobe's software do not come with the complete range of service and options as the full retail versions of the software.  [Vol. 1 at 166:8-168:5, 169:21-170:10; Ex. 15; see also Ex. 49.]

56.   Adobe has never authorized Defendants to reproduce any of its copyrights.  [Vol. 1 at 138:10-139:10; Vol. 2 at 247:10-18, 286:9-19; Ex. 15.]

57.   Adobe has never authorized Defendants to distribute its software.  [Vol. 1 at 138:10-139:10; Vol. 2 at 209:5-7, 247:10-18, 286:9-19, 339:24-340:5; Ex. 15.]

58.   Adobe's Software Licensing Agreement grants only a license to use Adobe's software products.  [Vol. 1 at 126:22-23, 139:12-13, 143:21-144:8, 144:21-146:2, 146:12-17; Vol. 2 at 337:17-339:23; Exs. 15, 16 (see Preamble, §§ 1.5, 2.1.1), 90.]

59.   Adobe retains all title to its software products.  [Vol. 1 at 126:23-127:1, 146:3-17; Exs. 15, 16 (see § 3), 90.]

60.   Adobe significantly restricts the use of its software products.  [Vol. 1 at 127:1-5, 146:19-147:15, 149:6-11, 149:25-150:4; Vol. 2 at 337:17-339:23; Exs. 15, 16 (see Preamble, §§ 1.5, 2.1.1, 3, 4.6.1, 4.6.2, 16.3), 90.]

61.   Adobe's software products are bound by a license.  [Vol. 1 at 126:5-128:25, 139:12-13, 144:11-19, 146:3-17; Vol. 2 at 260:3-11, 301:16-20, 337:17-339:23; Exs. 15, 16 (see Preamble, §§ 1.5, 2.1.1, 3, 4.6.1, 4.6.2, 16.3), 90.]

62.   Defendants have distributed unauthorized copies of Adobe's copyrighted software programs.  [Vol. 1 at 38:16-23, 40:4-23, 41:8-42:17; Exs. 1-2, 4, 12-48, 55-57, 59, 61-79, 85, 89-90, 96-97.]

63.   Defendants' sale of unauthorized copies of Adobe's software interferes with Adobe's right to control distribution of its software.  [Vol. 2 at 263:7-264:6, 279:11-13.]

64.   Adobe has been damaged as a result of Defendants' infringing conduct.  [Vol. 1 at 165:9-168:5; Vol. 2 at 229:18-234:14, 238:5-7, 239:1-240:2, 268:7-269:3, 271:20-272:11, 292:7-294:6.]

65.   Defendant Bea's Hive LLC was involved in Defendants' overall infringement as the entity directly purchasing and selling infringing Adobe software.  [Vol. 1 at 33:12-34:17, 38:16-23, 40:4-23, 41:8-42:17, 63:14-24, 73:16-23, 82:4-16, 89:2-17, 98:12-17, 99:13-17, 106:14-107:5; Vol. 2 at 264:7-14; Exs. 1-2, 4, 12-15, 17-48, 55-57, 59, 61-79, 85, 89-90, 96-97.]

66.   Defendant Fulfillment Solution Services, LLC, was involved in Defendants' overall infringement through the drop shipment of infringing Adobe software for

Defendant Bea's Hive LLC.  [Vol. 1 at 100:2-100:24, 106:14-107:5; Vol. 2 at 287:14-15, 296:13-297:18; Ex. 15.]

67.   Defendant New Epic Media LLC was involved in Defendants' overall infringement through the creation of websites for Defendants' customers using unauthorized copies of Adobe's copyrights and trademarks, including receiving money generated through the sale of infringing Adobe software.  [Vol. 1 at 65:17-82:16, 88:2-101:2, 107:23-111:16, 114:14-116:6; Vol. 2 at 247:10-249:18; Ex. 15.]

68.   Defendant SelaCorp, Ltd., was involved in Defendants' overall infringement by registering Bea's Hive LLC's domain name and supplying Bea's Hive LLC with infringing Adobe software.  [Vol. 1 at 41:8-42:17, 48:9-11, 53:18-54:6 (Selakovic and SelaCorp email addresses came up in thousands of hits on Bea's Hive LLC's servers), 55:1-56:12, 62:23-25, 190:20-194:9; Vol. 2 at 224:2-225:7, 342:23-345:20 (SelaCorp purchased and maintained beashive.org domain name for 5 years), 347:14-348:13; Exs. 15, 60, 90, 92, 97.]

69.   Defendant Supreme Growers LLC was involved in Defendants' overall infringement because its finances and business operations were intertwined with those of Defendant Bea's Hive LLC.  [Vol. 2 at 243:18-244:5, 295:20-297:18; Ex. 15.]

70.   Defendant Vegalab, LLC, was involved in Defendants' overall infringement as the owner of Defendants' warehouse located at 7652 Central Industrial Drive, West Palm Beach, Florida, at which both infringing product and business records evidencing Defendants' infringement were obtained.  More, Defendant Vegalab, LLC's finances and business operations were intertwined with those of

Defendant Bea's Hive LLC.  [Vol. 1 at 19:21-22; Vol. 2 at 242:16-243:10, 281:5-7, 295:20-297:18; Exs. 15, 90.]

71.    Defendant Steven Blackburn is an officer of, and participated in the operations of, Bea's Hive LLC, Fulfillment Solution Services, LLC, New Epic Media LLC, Supreme Growers LLC, and Vegalab, LLC.  [Vol. 1 at 41:8-42:17, 61:24-18, 64:8-9, 67:23-68:12, 73:16-23, 89:5-17, 99:17-101:2, 120:13-121:11; Exs. 15, 51-52, 86, 90.]

72.    Defendant Steven Blackburn directly participated in the infringing actions of Defendants.  [Vol. 1 at 41:8-42:17, 61:24-18, 73:16-23, 99:17-101:2, 120:13-121:11; Exs. 15, 51-52, 86, 90.]

73.    Although Defendant Steven Blackburn offered testimony contrary to many of the factual findings herein, Blackburn's testimony lacked credibility.  For example, Blackburn denied that he ever manufactured or knowingly purchased counterfeit software.  But when confronted with evidence that he possessed counterfeit Adobe products, Blackburn responded with the dubious explanation that he kept the software so that he could show it to other merchants and ask their opinions about it.  Further, Blackburn testified that he obtained copies of Adobe software from about ten sources, yet he could recall the name of only one such supplier.  [Vol. 2 at 317:23-318:12, 341:17-342:13.]

74.    Defendant David Selakovic is an officer of, and participated in the operations of, Bea's Hive LLC, New Epic Media LLC, SelaCorp, Ltd., Supreme Growers LLC, and Vegalab, LLC.  [Vol. 1 at 41:8-42:17, 48:9-11, 53:18-54:6 (Selakovic and SelaCorp email addresses came up in thousands of hits on Bea's Hive LLC's

servers), 55:1-56:12, 62:23-25, 64:8-9, 91:6-25; Vol. 2 at 224:2-225:7, 311:14-15, 313:18-314:3, 347:14-348:13; Exs. 15, 60, 90, 92, 97.]

75.   Defendant David Selakovic directly participated in the infringing actions of Defendants.  [Vol. 1 at 41:8-42:17, 48:9-11, 53:18-54:6 (Selakovic and SelaCorp email addresses came up in thousands of hits on Bea's Hive LLC's servers), 55:1-56:12, 91:6-25; Vol. 2 at 224:2-225:7, 312:15-21, 313:1-12, 342:23-345:20 (SelaCorp purchased and maintained beashive.org domain name for 5 years), 347:14-348:13; Exs. 15, 60, 90, 92, 97.]

76.   Defendants have extensively commingled their funds.  [Vol. 1 at 61:24-62:25, 67:23-24, 81:5-82:16, 92:6-93:16; Vol. 2 at 242:16-243:10, 243:18-244:5, 296:13-297:18.]

77.   Each of the Defendants has profited from Defendants' infringement.  [Vol. 1 at 67:25-69:24, 73:9-20, 81:5-82:16, 88:2-89:25, 92:6-93:16, 100:2-101:2, 106:14-107:5; Vol. 2 at 242:16-243:10, 243:18-244:5, 296:13-297:18.]

### Conclusions of Law

Based on the above Findings of Fact, the Court makes the following Conclusions of Law:

1.   To obtain a preliminary injunction against Defendants, Adobe must establish four elements:  (1) a substantial likelihood that it will prevail on the merits; (2) a substantial threat that it will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury to Adobe outweighs the harm an injunction may cause to Defendants; and (4) that granting the injunction will not disserve the public interest.  See Church v. City of Huntsville, 30 F.3d 1332, 1342 (11th Cir. 1994).

14

2.      Because a preliminary injunction is "an extraordinary and drastic remedy," it may

not be granted unless the moving party "clearly carries the burden of persuasion

as to the four prerequisites."  Id. (internal quotation marks omitted);

see McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir. 1998).

3.      Adobe has clearly met all four requirements for a preliminary injunction here.

4.      Adobe is likely to succeed on its trademark-infringement claim.  See 15 U.S.C.

§1114(1) (to establish a trademark-infringement claim, the plaintiff must

demonstrate that it owns the trademarks at issue, that the defendants have used

the marks without authorization, and that the defendants' use is likely to cause

confusion, mistake, or deception as to the source, affiliation, or sponsorship of

the defendants' goods).

5.      Adobe is likely to succeed in showing that it is the owner of valid trademarks.

See 15 U.S.C. § 1057(b) (certificate of registration constitutes prima facie

evidence of ownership); Court's Findings of Fact ("FOF") 1-2, 4.

6.      Adobe is likely to succeed in showing a likelihood of confusion in Defendants'

use of Adobe's trademarks.  See Safeway Store, Inc. v. Safeway Disc. Drugs,

Inc., 675 F.2d 1160, 1164 (11th Cir. 1982) (seven-factor test for likelihood of

confusion includes strength of mark, similarity of marks, similarity of goods,

similarity of sales methods, similarity of advertising, the defendant's intent, and

evidence of actual confusion); FOF 1, 5-53, 57.

7.      Adobe is likely to succeed in showing that Defendants are using Adobe's

trademarks in connection with the manufacture, importation, distribution, sale,

and/or offer for sale of products using counterfeits of Adobe's trademarks.

See 15 U.S.C. §1114; FOF 20-25, 53, 57.

15

8.    Adobe is likely to succeed in showing that Defendants' counterfeit use of Adobe's trademarks creates a likelihood of confusion.  See John H. Harland Co. v. Clarke Checks, Inc., 711 F.2d 966, 976 (11th Cir. 1983) (use of counterfeit marks on identical type of goods creates strong likelihood of confusion); Turner Greenberg Assocs. v. C & C Imps., 320 F. Supp. 2d 317, 1332 (S.D. Fla. 2004) (likelihood of confusion greater when an infringer uses the exact trademark); FOF 20-25, 38-53, 57.

9.    Alternatively, Adobe is likely to succeed in showing that Defendants are using Adobe's trademarks in connection with the manufacture, importation, distribution, sale, and/or offer for sale of unauthorized OEM, EDU, and/or foreign-made products using Adobe's trademarks.  See 15 U.S.C. §1114; FOF 5-20, 27-32, 34-37, 57.

10.   Adobe is likely to succeed in showing that Defendants' unauthorized use of Adobe's trademarks creates a likelihood of confusion.  See Safeway Store, Inc., 675 F.2d at 1164; FOF 5-20, 27-53.

11.   Adobe is likely to succeed on its false-designation claim against Defendants. See Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 780 (1992); FOF 5-53, 57.

12.   Adobe is likely to succeed in showing that Defendants have diluted and/or tarnished Adobe's world-famous trademarks.  See Brain Pharma, LLC v. Scalini, 858 F. Supp. 2d 1349, 1356-57 (S.D. Fla. 2012); FOF 1, 5-55, 57.

13.   Adobe is likely to succeed in showing that it is the owner of valid copyrights. See 17 U.S.C. § 410(c); FOF 1, 3.

14.   Adobe is likely to succeed in showing that Defendants have violated an exclusive

right under Adobe's copyrights.  See Walt Disney Co. v. Video 47, Inc., 972 F.

Supp. 595, 600 (S.D. Fla. 1996); see also Sharpshooters, Inc. v. Ret. Living Pub.

Co., Inc., 932 F. Supp. 286, 288 (S.D. Fla. 1996); FOF 5-21, 24-37, 56-57.

15.   Adobe is likely to succeed in showing that Defendants have made unauthorized,

altered copies of Adobe's copyrighted software.  FOF 21, 24-26, 56-57.

16.   Alternatively, Adobe is likely to succeed in showing that Defendants have sold

unauthorized versions of Adobe's copyrighted software in violation of Adobe's

licensing restrictions.  See S.O.S., Inc. v. Payday, Inc., 886 F.2d 1081, 1087

(9th Cir. 1989) (citing Gilliam v. Am. Broad. Cos., 538 F.2d 14, 20 (2d Cir. 1976)

("A licensee infringes the owner's copyright if its use exceeds the scope of its

license.")); FOF 5-20, 27-37, 56-62.

17.   Adobe is likely to succeed in showing that its software is licensed, not sold.

See Adobe Sys. Inc. v. Stargate Software Inc., 216 F. Supp. 2d 1051, 1060

(N.D. Cal. 2002) (Adobe grants only a right of use of its software); Adobe Sys.

Inc. v. Kornrumpf, 2011 WL 6303358, at *3 (N.D. Cal. Dec. 16, 2011) (Adobe's

OEM software subject to various licensing restrictions); Adobe Sys. Inc. v. One

Stop Micro, Inc., 84 F. Supp. 2d 1086, 1091 (N.D. Cal. 2000) (Adobe's EDU

software subject to various licensing restrictions); see also Vernor v. Autodesk,

Inc., 621 F.3d 1102, 1110-11 (9th Cir. 2010) (in determining whether software is

licensed rather than sold, courts should consider whether the copyright owner

specifies that the grant is only a license, whether significant restrictions are

placed on the transfer of the software, and whether the copyright owner imposes

notable use restrictions); FOF 5-6, 10, 17-18, 58-61.

17

18.     Adobe is likely to succeed in showing that the First Sale Doctrine does not apply to Defendants' manufacture, importation, distribution, sale, and/or offer for sale of Defendants' counterfeit and/or unauthorized products.  See Vernor v. Autodesk, Inc., 621 F.3d 1102, 1110-11 (9th Cir. 2010) (licenses are not subject to the First Sale Doctrine); Metal Morphosis, Inc. v. Acorn Media Publishing Inc., 639 F. Supp. 2d 1367, 1373 (N.D. Ga. 2009) (citing Amer. Int'l Pictures, Inc. v. Foreman, 576 F.2d 661, 664 (5th Cir. 1978)[1] ("[U]nless title to the copy passes through a first sale by the copyright holder, subsequent sales do not confer good title.")); Pegasus Imaging Corp. v. Allscripts Healthcare Solutions Inc., 2010 WL 497720, at *13 n.10 (M.D. Fla. Feb. 9, 2010) (First Sale Doctrine did not apply to software that was licensed not sold); Capitol Records LLC v. ReDigi Inc., 934 F. Supp. 2d 640, 655 (S.D.N.Y. 2013) ("[T]he first sale defense is limited to material items, like records, that the copyright owner put into the stream of commerce. Here, ReDigi is not distributing such material items; rather, it is distributing reproductions of the copyrighted code embedded in new material objects . . . . The first sale defense does not cover this any more than it covered the sale of cassette recordings of vinyl records in a bygone era."); see also Microsoft Corp. v. Blackburn, 589 F. Supp. 2d 1308, 1316 (S.D. Fla. 2008) (citing Wall Data Inc. v. Los Angeles Cnty. Sheriff's Dept., 447 F.3d 769, 785 n.9 (9th Cir. 2006) (noting that "first sale doctrine rarely applies in the software world because software is rarely 'sold'")); FOF at 5-20, 27-37, 56-62.

---

[1]  Decisions of the former Fifth Circuit issued before October 1, 1981, are binding precedent in the Eleventh Circuit.  See Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

19.    Defendants or other persons acting in concert with Defendants may transfer assets tied to the piracy operation if not restrained by the Court, thus frustrating Adobe's available remedy of disgorgement of profits.  See Levi Strauss & Co. v. Sunrise Int'l Trading, 51 F.3d 982, 987 (11th Cir. 1995) (asset freeze is appropriate in cases involving counterfeiting); see also Reebok Int'l Ltd. v. Marnatech Enters., Inc., 970 F.2d 552, 559 (9th Cir. 1992) ("Because the Lanham Act authorizes the district court to grant [the plaintiff] an accounting of [the defendant's] profits as a form of final equitable relief, the district court had the inherent power to freeze [the defendant's] assets in order to ensure the availability of that final relief."); FOF 64-76.

20.    Defendants' sale of such counterfeit and/or unauthorized products will result in immediate and irreparable injury to Adobe if a preliminary injunction is not granted.  See Robertson, 147 F.3d at 1310 ("A sufficiently strong showing of likelihood of confusion caused by trademark infringement may by itself constitute a showing of a substantial threat of irreparable harm." (alterations & internal quotation marks omitted)); EyePartner Inc. v. Kor Media Grp., LLC, 2013 WL 3733434, at *5 (S.D. Fla. July 13, 2013) ("[I]rreparable harm also is demonstrated in the record as to . . . the copyright infringement claim based on Plaintiff's lost licensing revenue from Defendants, the potential for Defendants to compete against Plaintiff with their derivative code, and the possibility that Defendants will share Plaintiff's unencrypted code with other potential customers or competitors."); Kornrumpf, 2011 WL 6303358, at *4 (irreparable harm found when reseller distributed OEM versions of Adobe's software in violation of licensing restrictions and in place of full retail versions); FOF 1, 33, 55, 63-64.

19

21.     The harm to Adobe of denying the requested preliminary injunction outweighs the harm to the legitimate interests of Defendants from granting such order. See E. Remy Martin & Co. v. Shaw-Ross Int'l Imports, 756 F.2d 1525, 1534 (11th Cir. 1985) (balance of hardships strongly weighs in favor of a trademark owner who has invested considerable time and resources in the development of its products and establishment of its marks); C.B. Fleet Co., Inc. v. Unico Holdings, Inc., 510 F. Supp. 2d 1078, 1083 (S.D. Fla. 2007) (quoting CBS, Inc. v. Primetime 24 Joint Venture, 9 F. Supp. 2d 1333, 1345 (S.D. Fla. 1998) (observing that "a company cannot build a business on [copyright] infringements and then argue that enforcing the law will cripple that business")); FOF 33, 55, 63-64.

22.     The public interest is served by issuance of a preliminary injunction against Defendants.  See CBS Broad., Inc. v. EchoStar Comm'ns Corp., 265 F.3d 1193, 1198 (11th Cir. 2001) (preliminary injunction on copyright claim serves the "public interest because the public interest lies with protecting the rights of copyright owners"); C.B. Fleet Co., 510 F. Supp. 2d at 1084 ("The public interest can only be served by upholding copyright protection and preventing the misappropriation of protected works."); Nailtiques Cosmetic Corp. v. Salon Scis., Corp., 1997 WL 244746, at *5 (S.D. Fla. Jan. 10, 1997) (consuming public has an interest in not being misled or deceived by infringing products); FOF 33, 55.

23.     Each of the Defendants has participated in the infringement of Adobe's trademarks and copyrights.  FOF 65-76.

**Order**

Accordingly, in view of the Court's factual findings and legal conclusions, it is

**ORDERED AND ADJUDGED** that Plaintiff's Motion for Preliminary Injunction

[DE 5] is hereby **GRANTED** as follows:

1.    Defendants, their officers, agents, servants, employees, attorneys, and any

persons, firms, or corporations acting in concert or in participation with them are

hereby restrained and enjoined from:

a.    Directly or indirectly infringing Adobe's trademarks and copyrights, listed

respectively in Exhibits A and B to Adobe's Proposed Findings of Fact and

Conclusions of Law [DE 51-1; DE 51-2], in any manner, including

generally, but not limited to, manufacturing, importing, exporting,

advertising, downloading, uploading, purchasing, distributing, selling,

offering for sale, or distributing any counterfeit or unauthorized products,

which bear any of Adobe's trademarks or copyrights or any colorable

imitations thereto and, specifically:

i.    Manufacturing, importing, exporting, advertising, downloading,

uploading, purchasing, selling, offering for sale, or distributing any

educational or academic software products ("EDU") bearing any of

Adobe's trademarks or copyrights;

ii.    Manufacturing, importing, exporting, advertising, downloading,

uploading, purchasing, selling, offering for sale, or distributing any

Original Equipment Manufacturer software products ("OEM")

bearing any of Adobe's trademarks or copyrights;

iii.    Manufacturing, importing, exporting, advertising, downloading,

uploading, purchasing, selling, offering for sale, or distributing

within the United States any software products not made in the

United States, which bear any of Adobe's trademarks or copyrights;

iv.    Manufacturing, importing, exporting, advertising, downloading,

uploading, purchasing, selling, offering for sale, or distributing any

activation codes, keys, or serial numbers relating to any of Adobe's

trademarks or copyrights;

b.    Maintaining active for downloading purposes any servers, computer

terminals and/or portals, or any electronic storage medium containing any

of Adobe's trademarks or copyrights;

c.    Manufacturing, importing, exporting, advertising, downloading, uploading,

purchasing, selling, offering for sale, or distributing any unauthorized

promotional materials, labels, packaging, or containers which picture,

reproduce, copy or use the likenesses of, or bear a substantial similarity

to, Adobe's trademarks or copyrights;

d.    Engaging in any conduct that tends falsely to represent that, or is likely to

confuse, mislead, or deceive purchasers, Defendants' customers and/or

members of the public to believe that, the actions of Defendants, the

products sold by Defendants, or Defendants themselves are connected

with, are sponsored, approved, or licensed by Adobe, or are in some way

affiliated with Adobe;

e.    Affixing, applying, annexing or using in connection with the manufacture,

import, export, advertisement, download, upload, purchase, sale, offer for

sale, distribution, or any other use of any goods or services, a false

description or representation, including words or other symbols, tending to falsely describe or represent such goods or services as being those of Adobe;

f.  Destroying or otherwise disposing of:

i.  Merchandise falsely bearing Adobe's trademarks or copyrights or any colorable imitations thereto;

ii.  Any labels, packages, wrappers, containers, or any other unauthorized promotion or advertising material items which reproduce, copy, counterfeit, imitate, or bear any of Adobe's trademarks or copyrights or any colorable imitations thereto;

iii.  Any molds, screens, patterns, plates, negatives or other elements used for making or manufacturing products or packaging related to Adobe's trademarks or copyrights or any colorable imitations thereto;

iv.  Any sales and supply of customer journals, ledgers, invoices, purchase orders, inventory control documents, bank records, catalogs, and all other business records believed to concern the manufacture, import, export, advertisement, download, upload, purchase, sale, offer for sale, or distribution of any products that bear Adobe's trademarks or copyrights or any colorable imitations thereto; and

v.  Any and all computers, tablets, servers, blades, electronic storage devices, data, metadata, electronic storage media, disks, CDs,

DVDs, drives, flash drives, hard drives, or related computer systems that include, denote, contain, possess, maintain and/or are used to transfer any software, computer source code, computer information, decrypted code, directories, files, libraries, and any related data that relate (either directly or indirectly) to Adobe's trademarks or copyrights.

2. Defendants, their officers, agents, servants, employees, attorneys, and any persons, firms, or corporations acting in concert or in participation with them are also restrained from transferring any assets related to Defendants' infringing business operations, pursuant to the Court's Orders barring such transfers.

3. Adobe's Bond posted in connection with the Court's Temporary Restraining Order, Order Restraining Transfer of Assets, Order for Seizure and Impoundment of Counterfeit Goods, and Order Setting Hearing on Preliminary Injunction [DE 13] ("TRO"), in the amount of $100,000.00, shall remain in effect. See DE 15; DE 16.  Adobe shall not be required to post any additional bond relating to the Preliminary Injunction.

4. Counsel for Adobe shall continue to act as provisional custodian for the Court of any items seized and impounded pursuant to the TRO.

5. All provisions of the TRO relating to the handling of any items seized and impounded pursuant to the TRO, specifically paragraphs 14 through 21, shall remain in effect.

6. Except as otherwise provided in this Order, the TRO is hereby lifted.

7. This Preliminary Injunction shall be deemed to have been served upon Defendants at the time of its execution and entry by the Court.

It is further

**ORDERED AND ADJUDGED** that Defendant's Request that the Court Take

Judicial Notice [DE 41], which relates to a separate lawsuit against Defendants and

other parties in Colorado federal court, is hereby **DENIED AS MOOT**, since that case

has no bearing on Adobe's Motion.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County,

Florida, this 18th day of September, 2014.

JAMES I. COHN
United States District Judge

Copies provided to:

Counsel of record via CM/ECF